STATE OF MINNESOTA

IN SUPREME COURT

A14-0143

Original Jurisdiction                                                    Per Curiam

In re Petition for Disciplinary Action
against William L. French, a Minnesota                          Filed:  June 3, 2015
Attorney, Registration No. 131945                         Office of Appellate Courts

_____

Martin A. Cole, Director, Siama Y. Chaudhary, Senior Assistant Director, Office of
Lawyers Professional Responsibility, Saint Paul, Minnesota, for petitioner.

Kay Nord Hunt, Phillip A. Cole, Lommen Abdo, P.A., Minneapolis, Minnesota, for
respondent.

_____

S Y L L A B U S

1.      The referee did not clearly err in finding that cost bond refunds in two

client matters belonged to respondent and in concluding that respondent did not

misappropriate clients' funds when he did not deposit these refunds into client trust

accounts.

2.      Respondent's failure to communicate and work diligently on a client matter

and his failure to deposit unearned, advance fees into his trust account warrants a public

reprimand and 1 year of supervised probation.

1

O P I N I O N

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility filed petitions for disciplinary action against respondent William L. French, alleging that French committed professional misconduct in three client matters. Following an evidentiary hearing, the referee concluded that French did not commit professional misconduct in the first two matters, but that he did violate Minn. R. Prof. Conduct 1.3, 1.4(a)(3), 1.4(a)(4), and 1.15(a) in the third matter. We conclude that the referee's findings and conclusions are not clearly erroneous and that a public reprimand with 1 year of supervised probation is the appropriate discipline for French's misconduct.

French has been licensed to practice law in Minnesota since October 30, 1981. The Director filed a petition for disciplinary action against French, alleging violations in his separate representations of J.T. and J.B./M.B. The Director later filed a supplementary petition for disciplinary action, alleging violations in French's representation of K.L., and a second supplementary petition for disciplinary action, alleging violations based on attorney's lien notices French filed during the pendency of this disciplinary action. We appointed a referee to make findings of fact and conclusions and to recommend appropriate discipline. We will address the facts of each client matter in turn.

*J.T. Matter*

Beginning in September 2007, French represented J.T. in a lawsuit J.T. had commenced against attorney T.M. In 2010, summary judgment was granted in favor of

2

T.M. with respect to J.T.'s claims. French agreed to represent J.T. in an appeal from the judgment, but required J.T. to pay him $1,200. J.T. paid French $1,200 on February 3, 2010, and the memo portion of his check stated "Cover Fees for Appeal." French did not put the $1,200 in his trust account. French paid costs related to the appeal totaling $1,404.75, including a cost bond of $500. The appeal was unsuccessful, and French withdrew from J.T.'s representation in August 2010. In January 2011, French received a $500 check refunding J.T.'s cost bond. French deposited the $500 in his operating account and did not notify J.T. of his receipt of the refund.

The parties dispute whether J.T.'s $1,200 payment was meant to cover costs, attorney fees, or both. The Director alleged that the payment was exclusively for costs, and that by keeping the cost bond refund, rather than placing it in his trust account, French misappropriated client funds and failed to communicate with J.T. about the refund, in violation of Minn. R. Prof. Conduct 1.4(a)(3),[1] 1.15(a) and (c)(1),[2] and 8.4(c) and (d).[3] French, for his part, claimed that the payment was a "flat fee" and that he had

---

[1]     Rule 1.4(a)(3) of the Minnesota Rules of Professional Conduct requires a lawyer to "keep the client reasonably informed about the status of the matter."

[2]     Rule 1.15(a) of the Minnesota Rules of Professional Conduct requires all funds of clients or third persons held by a lawyer in connection with a representation to be deposited in one or more identifiable trust accounts. Rule 1.15(c)(1) requires a lawyer to "promptly notify a client or third person of the receipt of the client's or third person's funds, securities, or other properties."

[3]     Rule 8.4(c) of the Minnesota Rules of Professional Conduct prohibits a lawyer from engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation." Rule 8.4(d) of the Minnesota Rules of Professional Conduct prohibits a lawyer from "engag[ing] in conduct that is prejudicial to the administration of justice."

no obligation to place any portion of the payment in his trust account or to notify J.T. of the cost bond refund. French notes that after the $500 cost bond refund was deducted from J.T.'s appellate costs paid by French, the remaining appellate costs were $904.75. And when this amount is subtracted from J.T.'s $1,200 payment, French was left with $295.25, which he kept as a fee for the legal work he performed on the appeal.

The referee found that the $1,200 was a "flat rate to cover fees and expenses." According to the referee, all of the money "had either been earned or expended by the time the $1,200 came into Mr. French's possession," and therefore the $1,200 constituted French's own funds. Although French did not deposit the $500 cost bond refund in his trust account, the referee found that French's conduct "was the product of his understanding that the refund check was his money, a belief that was, in good faith, justified by the facts of the transaction with the client." The referee found that the cost bond refund was French's property, and therefore concluded that the Director had not proven that French had committed misconduct.

Additionally, during the pendency of these disciplinary proceedings, French filed and served upon J.T. a notice of attorney's lien, claiming entitlement to $500 as fees and costs due to him. The lien action was French's attempt to establish that he was legally entitled to the $500 cost bond refund. The district court granted the lien, and French filed a satisfaction of judgment. The Director alleged that this lien notice was a frivolous claim and that it represented an attempt to collect unreasonable fees, in violation of

4

Minn. R. Prof. Conduct 1.5(a),[4] 3.1,[5] and 8.4(d). The referee concluded that the notice of attorney's lien, "while perhaps unnecessary, especially in light of these pending proceedings, does not rise to the level of a violation of the Rules of Professional Conduct."

*J.B./M.B. Matter*

Beginning in April 2007, French represented J.B. and M.B. in litigation regarding an easement. J.B. and M.B. lost the case, and French sent a letter to them, dated December 2, 2008, stating, "I am willing to handle an appeal at no additional cost for attorney fees provided that the outstanding bill [attached to the letter ($3,100.68)] plus $1,100 (for expenses) is paid on or before an appeal is undertaken." French claims that J.B. and M.B. did not agree to the terms of this offer, but that they came to a new agreement over the phone, pursuant to which J.B. and M.B. would pay French a total of $5,000 in attorney fees, inclusive of the $3,100.68 outstanding, with $2,500 paid before the filing of the notice of appeal and $2,500 paid in 30 days. There is a dispute, however, over whether J.B. and M.B. actually agreed to these terms.

On December 9, 2008, J.B. and M.B. paid French $2,500. French filed the notice of appeal and advanced $1,126.67 in appellate costs, including a $500 cost bond, from his own funds. On January 19, 2009, French sent a letter to J.B. and M.B. stating, "Just a

---

[4]  Rule 1.5(a) of the Minnesota Rules of Professional Conduct requires a lawyer to charge reasonable fees.

[5]  Rule 3.1 of the Minnesota Rules of Professional Conduct prohibits a lawyer from "bring[ing] . . . a proceeding . . . unless there is a basis in law and fact for doing so that is not frivolous."

5

reminder that the second payment of $2,500 is due, as per our agreement. Once that has been paid, your account will be paid in full." The letter did not mention the $1,126.67 in costs, but French testified that the $2,500-plus-$2,500 agreement was only for attorney fees, and did not include expenses. J.B. sent French a check for $1,700.68 on January 31, 2009 marked "Pmt in Full." J.B. and M.B. paid French a total of $4,200.68, which is the same amount reflected in French's December 2 letter, but approximately $800 short of the agreement French claims the parties reached over the phone.

J.B. and M.B. lost their appeal, and French received a partial cost bond refund of $145.21.[6] French did not deposit the refund into his trust account, but instead deposited it in his operating account, and did not notify J.B. and M.B. that he had received a refund. Based on his handling of this cost bond refund, the Director alleged the same misconduct as in the J.T. matter: violations of Minn. R. Prof. Conduct. 1.4(a)(3), 1.15(a) and (c)(1), and 8.4(c) and (d).

The referee found that "[t]he weight of the evidence on the fee agreement between [J.B. and M.B.] and [French] supports [French]'s claim that he had agreed with his clients to take the appeal for a $5,000 fee inclusive of payment of the balance due him prior to the appeal of $3,100.6[0]." The $145.21 refund was therefore French's money, the referee concluded, and "reduced his cost outlay . . . from $1,126.67 to $981.46 and allowed him to apply the refund to the outstanding fee balance per the $5,000

---

[6] Costs of $354.79 were taxed against J.B. and M.B. in the court of appeals, so only $145.21 of the $500 cost bond was refunded.

agreement." The referee therefore concluded that the Director had not proven that French had committed misconduct with respect to the J.B./M.B. matter.

As he did with J.T., during the pendency of these disciplinary proceedings, French filed and served upon J.B. and M.B. a notice of attorney's lien claiming entitlement to $800 as fees and costs due to him, in an attempt to establish that he was legally entitled to the $145 cost bond refund. The Director alleged that this lien notice was a frivolous claim and that it was an attempt to collect unreasonable fees. The referee again concluded that the notice of attorney's lien was perhaps unnecessary but did not violate the Rules of Professional Misconduct.

*K.L. Matter*

On December 18, 2009, French told K.L. that he would require a $1,200 retainer to represent her in a dispute with a bank regarding its handling of her father's trust. K.L. sent French a check for $1,500 (according to K.L., the extra $300 was included as a show of good faith on her part for French's services). Based on a $200 per hour rate, French had billed K.L.'s account $400 at the time he received the $1,500 payment. He deposited the entire payment into his operating account and at no point retained the unearned balance in a trust account. French applied the funds as intended by K.L. to pay for his legal services, and he later refunded the entire sum when she expressed her dissatisfaction with his services.

The Director alleged that French violated Rules 1.15(a), 1.3, and 1.4(a)(3) and (4) for his conduct in the K.L. matter. The referee found that by depositing K.L.'s check in his operating account, French failed to safeguard client funds and violated Rule 1.15(a).

7

The referee concluded that French's failure was careless but was not done with intent to use the funds for any purpose other than for what K.L. had intended. The referee also found that between December 18, 2009 and January 29, 2014, French did little or no substantive work on K.L.'s case and did not adequately communicate with K.L. regarding the case. The referee concluded that French's failure to communicate with K.L. and to work diligently on her case violated Minn. R. Prof. Conduct 1.3 and 1.4(a)(3) and (4). Neither party has challenged the referee's findings of fact or conclusions in the K.L. matter.

I.

In a disciplinary proceeding, the Director has the burden "to prove by clear and convincing evidence that the respondent violated the Rules of Professional Conduct." *In re Michael*, 836 N.W.2d 753, 761 (Minn. 2013). Because the Director ordered a transcript, "the referee's findings of fact and conclusions of law are not conclusive." *In re Ulanowski*, 800 N.W.2d 785, 793 (Minn. 2011). Nevertheless, "we give great deference to the referee's findings of fact and will not reverse those findings 'if they have evidentiary support in the record and are not clearly erroneous.'" *In re Coleman*, 793 N.W.2d 296, 303 (Minn. 2011) (quoting *In re Varriano*, 755 N.W.2d 282, 288 (Minn. 2008)). A finding is clearly erroneous if we are "'left with the definite and firm conviction that a mistake has been made.'" *In re Lyons*, 780 N.W.2d 629, 635 (Minn. 2010) (quoting *Gjovik v. Strope*, 401 N.W.2d 664, 667 (Minn. 1987)). We review the interpretation of the Minnesota Rules of Professional Conduct de novo but will "review

the application of the [rules] to the facts of the case for clear error." *In re Aitken*, 787 N.W.2d 152, 158 (Minn. 2010).

Before our court, the Director challenges the referee's findings in both the J.T. and the J.B./M.B. matters. The referee's central finding in the J.T. matter was that J.T.'s $1,200 payment was for costs *and* fees, and therefore, the cost bond refund was French's property. The Director argues that this finding is clearly erroneous and that the payment was only for costs. If, as the Director argues, J.T.'s $1,200 payment was only for costs, then the amount refunded should have been deposited in French's trust account because J.T. paid French more than the costs actually incurred for his appeal. Specifically, J.T. paid French $1,200, and French paid $1,404.75 in costs related to the appeal, but subtracting the $500 that was refunded, the total cost of the appeal was $904.75 and J.T. overpaid French by $295.25. The Director states that French "may have had some potential claim to $204.75 ($1,404.75 minus $1,200)," but contends French committed misconduct by not safeguarding the entire amount of the refund by depositing it in his trust account, and then resolving that claim with J.T.

In the J.B./M.B. matter, the referee found that French agreed to take the appeal for a fee of $5,000 (inclusive of the $3,100.68 balance already due) in two $2,500 installments. The Director argues that this finding is clearly erroneous, and that the actual agreement was the initial written proposal, contained in French's December 2, 2008, letter, of the $3,100.68 fee balance plus $1,100 in costs. Because J.B. and M.B. paid French $4,200.68, including $1,100 in appellate costs, and appellate costs were only

$981.46 ($1,126.67-$145.21 (amount of refund)), the Director argues that French committed misconduct by keeping the full refund amount.

In both matters, the record contains conflicting evidence about the terms of French's fee agreements with his clients. J.T. gave inconsistent statements regarding his understanding of the purpose of the $1,200 payment. In his testimony, J.T. said that he was "under the impression that the $1,200 was for the cost of the appeal." But when French's counsel asked, "For fees and costs?" J.T. responded, "Yes, everything, whatever." After further cross-examination, J.T. reverted to his claim that the payment was for costs, saying, "I was led to believe that it was all costs." The memo portion of the check, however, stated that the money was to "Cover Fees for Appeal." J.T. also confirmed that "when all was said and done, all it would ever cost [him] is $1200." J.T.'s understanding of the purpose of the $1,200 payment, based on this evidence, is ambiguous.

French's position regarding the J.T. matter was similarly less than clear. On August 16, 2010, French wrote J.T. a letter stating that J.T.'s payment was "for the expenses related to the appeal." In explaining this letter, French testified that he was simply "giving [J.T.] the benefit of the doubt" that he would apply the $1,200 to costs. In two separate letters to the district court ethics committee investigator, French also stated that the $1,200 was for costs or expenses. But in his October 2013 affidavit, French stated that he told J.T. that the $1,200 would cover French's "attorney fees and costs for the appeal." In his testimony before the referee, French claimed that the $1,200 was for attorney fees only, not costs.

10

The J.B./M.B. matter also includes conflicting evidence. The Director's position that the agreement was for the $3,100.68 fee balance due plus $1,100 in appellate costs is supported by the December 2, 2008, letter French sent as well as J.B.'s testimony. Prior to his answer to the petition for discipline, French made statements suggesting that the fee agreement was reflected in the December 2 letter. In a November 2013 letter to the Director, French stated "I agreed to do the appeal for a minimal amount, viz., for the payment of an outstanding bill plus $1,100.00." In a December 2013 letter to the Director, French stated, "By paying $2,500 on 12-9-08 and $1,700 on 2-16-09, [J.B. and M.B.] satisfied the condition for the appeal as stated in my letter to them dated 12-2-08." French claims that at the time he wrote those letters, he was relying on his memory and made a careless error. He claims it was only after he looked at the file that he realized the parties reached a different agreement—the one he contends was reached over the phone.

French's position is supported by handwritten notes of his phone calls with J.B. and M.B., his January 2009 letter to J.B. and M.B. requesting the second $2,500 payment, and his own testimony. Further, J.B. and M.B. did not in fact meet the terms of the December 2, 2008, letter, which requested that they pay the $3,100 balance *before* French filed the notice of appeal. Instead, J.B. paid French $2,500 and French filed the appeal, suggesting that the parties may have, as French contends, reached an agreement over the phone.

The lack of written agreements and French's inconsistent recollections raise some doubts about what agreements were reached in both the J.T. and J.B./M.B. matters. But we do not reverse a referee's findings unless they are clearly erroneous, "especially when

the referee's findings rest on disputed testimony or in part on credibility, demeanor, and sincerity." *In re Lyons*, 780 N.W.2d 629, 635 (Minn. 2010). There is support in the record for the referee's conclusion that J.T.'s $1,200 payment was for costs and attorney fees, and that J.B. and M.B. agreed to make two $2,500 payments (inclusive of the $3,100.68 balance due) for attorney fees. We therefore conclude that the referee's findings are not clearly erroneous.

Based on the referee's finding that J.T.'s $1,200 payment was for attorney fees and costs, the $500 cost bond refund was French's property. The $500 cost bond refund reduced French's cost outlay to $904.75 and allowed him to earn a fee of $295.25 for the appeal. Similarly, based on the referee's finding that J.B. and M.B. had agreed to pay French $5,000 in attorney fees but paid him only $4,200 and that French advanced a total of $1,126.67 in appellate costs from his own funds, including a $500 cost bond, the $145.21 cost bond refund also belonged to French. French therefore did not have a duty to place the cost bond refunds in trust, to inform the clients of his receipt of the money, or to return this money to his clients. As a result, the referee did not clearly err in concluding that the Director did not prove by clear and convincing evidence a violation of Minn. R. Prof. Conduct 1.4(a)(3), 1.15(a) and (c)(1), or 8.4(c) and (d).

As to the attorney's lien issue, we hold that the referee did not clearly err in concluding that French did not commit professional misconduct by filing the liens. An attorney is entitled to a lien for compensation "whether the agreement for compensation is expressed or implied . . . upon the interest of the attorney's client in any money or property involved in or affected by any action or proceeding in which the attorney may

12

have been employed." Minn. Stat. § 481.13, subd. 1(a) (2014). French had a good faith basis for claiming he had a legal right to the contested money. Facing potential discipline for misappropriating client funds, he sought the liens to help establish his legal right to the contested funds. French did not attempt to collect any additional fees from his clients beyond the amounts he contended he was owed. Further, the district court granted the lien in the J.T. matter, which supports the referee's conclusion that the lien was not a frivolous claim. In short, the record provides support for the referee's conclusion that French's lien notices did not violate Minn. R. Prof. Conduct 1.5(a), 3.1, or 8.4(d).

In sum, we hold that the referee did not clearly err in concluding that the Director did not prove that French committed misconduct in either the J.T. or J.B./M.B. matters.

II.

We turn next to the question of the appropriate discipline for French's misconduct in the K.L. matter. In determining discipline, we place great weight on the referee's recommendation, but we retain the ultimate responsibility for determining the appropriate sanction. *In re Coleman*, 793 N.W.2d 296, 308 (Minn. 2011). Here, the referee recommended that French be publicly reprimanded and placed on supervised probation for 1 year for his violation of Rules 1.3, 1.4(a)(3) and (4), and 1.15(a) in the K.L. matter. French does not challenge that recommendation. The Director requests greater discipline, but this request is based on the Director's contention that French committed misconduct in the J.T. and J.B./M.B. matters. As discussed above, we affirm, as not clearly erroneous, the referee's conclusion that French did not commit misconduct in the J.T. and J.B./M.B. matters. The Director agreed at oral argument that for French's

13

misconduct in the K.L. matter alone, the discipline the referee recommended is appropriate.

The purpose of sanctions for professional misconduct "is not to punish the attorney, but rather to protect the public, to protect the judicial system, and to deter future misconduct." *In re Plummer*, 725 N.W.2d 96, 98 (Minn. 2006). In imposing discipline, we are guided by four factors: "(1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public; and (4) the harm to the legal profession." *In re Nelson*, 733 N.W.2d 458, 463 (Minn. 2007). We look to the discipline we have imposed in similar cases and consider any "aggravating and mitigating factors that distinguish a particular case." *In re Albrecht*, 845 N.W.2d 184, 191 (Minn. 2014).

French's misconduct in the K.L. matter entailed the failure to place unearned, advance fees in a trust account, the failure to communicate with a client, and the failure to work diligently on that client matter. The referee found that French's handling of K.L.'s money was careless, but was not done in bad faith. French used the money for its intended purpose by applying it toward his work on K.L.'s case, and ultimately refunded the entire payment when K.L. complained about the quality of his work. French's lack of diligence and communication is more troubling. He did very little work for several years, was evasive in response to K.L.'s requests for updates, and failed to adequately communicate with his client.

As to the cumulative weight of the violations, " 'we distinguish between a single, isolated incident' " and " 'multiple instances of mis[conduct] occurring over a substantial

14

amount of time.' " *In re Murrin*, 821 N.W.2d 195, 208 (Minn. 2012) (alteration in original) (quoting *In re Fairbairn*, 802 N.W.2d 734, 743 (Minn. 2011)). We have said "that the cumulative weight and severity of multiple disciplinary rule violations may compel severe discipline even when a single act standing alone would not have warranted such discipline." *In re Oberhauser*, 679 N.W.2d 153, 160 (Minn. 2004). French's mishandling of funds in the K.L. matter was an isolated incident. His failure to keep K.L. informed and diligently handle her case involved a single client matter, but occurred over a period of several years.

Assessing the harm to the public and the legal profession "requires consideration of 'the number of clients harmed [and] the extent of the clients' injuries.' " *Coleman*, 793 N.W.2d at 308 (alteration in original) (quoting *In re Randall*, 562 N.W.2d 679, 683 (Minn. 1997)). French's misconduct affected only a single client. His failure to deposit K.L.'s payment in a trust account did not harm her, as the funds were applied to his work on K.L.'s behalf and in any event were refunded to K.L. His failure to work diligently on K.L.'s case, however, may have discouraged K.L. from pursuing a valid legal claim. These failures "are intensely frustrating to the client, reflect adversely on the bar, and are destructive of public confidence in the legal profession." *In re Shaughnessy*, 467 N.W.2d 620, 621 (Minn. 1991).

We next consider the existence of aggravating or mitigating factors. Neither party challenges the aggravating and mitigating factors found by the referee. As aggravating factors, the referee found that French has a history of prior discipline involving the same type of misconduct he committed in this case. *See In re Jaeger*, 834 N.W.2d 705, 711

(Minn. 2013) (noting that an attorney's prior disciplinary history is an aggravating factor). French was admonished in 1995 and 2000. On both occasions, he failed to communicate with a client and diligently pursue a client matter. The referee also found that French has extensive experience in the practice of law, and we have held that substantial experience may constitute an aggravating factor. *See In re Rebeau*, 787 N.W.2d 168, 176 (Minn. 2010).

For mitigating factors, the referee discussed the testimony of three witnesses in support of French's honest character. *See In re Milloy*, 571 N.W.2d 39, 47 (Minn. 1997) (stating that a lawyer's good reputation in the community may be a mitigating factor). These witnesses testified that French possesses a reputation among lawyers in the community "of good repute for honesty and commitment to the interests of his clients." According to the witnesses, French is known as the "lawyer of last resort" in Rochester, taking on cases for the underdog even when they are not profitable. The referee concluded, "[t]hese are not the actions of an indifferent or mercenary lawyer and weigh heavily in consideration of the appropriate discipline."

Finally, we look to similar cases to "ensure that our disciplinary decision is consistent with prior sanctions." *In re Nathanson*, 812 N.W.2d 70, 80 (Minn. 2012). One case with similar facts is *In re Letourneau*, 712 N.W.2d 183 (Minn. 2006). In *Letourneau*, the respondent, Dennis Letourneau, did not commence a client's action before the statute of limitations expired and failed to inform the client when the statute of limitations expired. *Id.* at 186. Similar to French, Letourneau had received discipline twice before, and had credible witness testimony about his honest reputation as a lawyer.

16

*Id.* at 187. We ordered a public reprimand and 1 year of supervised probation—the same discipline the referee recommended for French. *Id.* at 189; *see also In re Owens*, 843 N.W.2d 225, 225-26 (Minn. 2014) (order) (ordering public reprimand and 2 years of supervised probation for failing to communicate with a client, neglect of a client matter, and failure to return phone calls of former client's attorney); *In re Brenner*, 460 N.W.2d 54, 55 (Minn. 1990) (order) (ordering public reprimand and 1 year of supervised probation for failing to appear at a hearing, failing to properly serve documents, and failing to return a client's phone calls).

Based on our analysis, we conclude that the referee's recommendation is appropriate and that French's misconduct warrants a public reprimand and 1 year of supervised probation.

Accordingly, we order that:

1.      Respondent William L. French is publicly reprimanded.

2.      Respondent is placed on supervised probation for a period of 1 year, subject to the following conditions:

> a.      Respondent shall cooperate fully with the Director's Office in its efforts to monitor compliance with this probation. Respondent shall promptly respond to the Director's correspondence by its due date. Respondent shall provide the Director with a current mailing address and shall immediately notify the Director of any change of address. Respondent shall cooperate with the Director's investigation of any allegations of unprofessional conduct that may come to the Director's attention. Upon the Director's request, respondent shall provide authorization for release of information and documentation to verify respondent's compliance with the terms of this probation.
>
> b.      Respondent shall abide by the Minnesota Rules of Professional Conduct.

c.      Respondent shall be supervised by a licensed Minnesota attorney, appointed by the Director to monitor compliance with the terms of this probation.  Respondent shall provide to the Director the names of four attorneys who have agreed to be nominated as Respondent's supervisor within 2 weeks from the date of this order.  If, after diligent effort, Respondent is unable to locate a supervisor acceptable to the Director, the Director will seek to appoint a supervisor.  Until a supervisor has signed a consent to supervise, Respondent shall on the first day of each month provide the Director with an inventory of active client files described in paragraph d. below.  Respondent shall make active client files available to the Director upon request.

d.      Respondent shall cooperate fully with the supervisor in the supervisor's efforts to monitor compliance with this probation.  Respondent shall contact the supervisor and schedule a minimum of one in-person meeting per calendar quarter.  Respondent shall submit to the supervisor an inventory of all active client files by the first day of each month during the probation.  With respect to each active file, the inventory shall disclose the client name, type of representation, date opened, most recent activity, next anticipated action, and anticipated closing date.  Respondent's supervisor shall file written reports with the Director at least quarterly, or at such more frequent intervals as may reasonably be requested by the Director.

e.      Respondent shall initiate and maintain office procedures that ensure that there are prompt responses to correspondence, telephone calls, and other important communications from clients, courts and other persons interested in matters that respondent is handling, and which will ensure that respondent regularly reviews each and every file and completes legal matters on a timely basis.

f.      Within 30 days from the filing of this opinion, respondent shall provide to the Director and to the probation supervisor, if any, a written plan outlining office procedures designed to ensure that respondent is in compliance with the probation requirements.  Respondent shall provide progress reports as requested.

3.      The Director did not request costs, pursuant to Rule 24(a), Rules on

Lawyers Professional Responsibility in his brief, and we decline to award costs.